UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
_____
                       :
JOHN BANDA,            :
                       :
         Plaintiff,    :      Civil No. 09-2723 (WJM)
                       :
      v.               :
                       :
OTINO, et al.,         :      **MEMORANDUM OPINION**
                       :
         Defendants.   :
_____:
```

**Martini**, District Judge:

This matter comes before the Court upon the Clerk's
docketing of Plaintiff's "To Whom It May Concern" letter,
see Docket Entry No. 4, and – for the reasons stated below –
Plaintiff's letter indeed causes this Court grave concern in
light of Plaintiff's past abusive litigation practices and still
ongoing apparent disregard to the order of preclusion already
issued against him.  This Court, therefore, will amplify the
currently existing order of preclusion.

I.   **The History of Plaintiff's Litigations**

Since it appears that Plaintiff entered civil confinement no
later than in January of 2004, see Banda v. New Jersey, 05-3183
(JAG) (N.J.D.), Docket Entry No. 2, at 2 (stating that, by
January 30, 2004, Plaintiff was already involuntary civilly
committed at his current place of confinement, i.e., the Special
Treatment Unit Annex, Avenel, New Jersey ("Avenel"), as a
sexually violent predator, pursuant to the Sexually Violent

Predator Act ("SVPA"), N.J. Stat. Ann. § 30:4-27.24, et seq.),
the Court subdivides, for ease of comprehension, the multitude of
Plaintiff's litigations into two groups, i.e., the litigations
initiated before Plaintiff entered civil commitment[1] and those
commenced after Plaintiff became a civilly committed individual.[2]

### A.   **Actions Initiated Prior to Civil Confinement**

####   1.   **Civil Actions Nos. 00-669 (JEI) and 00-1851 (JHR)**

It appears that Plaintiff's first exercise in federal
litigation took place on February 14, 2000, when he filed a pro
se civil complaint in Banda v. Medford Police, 00-669 (JEI)

---

[1]  Plaintiff transferred into his civil commitment from an
incarceration based on one of his criminal conviction.  See Banda
v. Burlington County, 03-2045 (JEI) (D.N.J.), Docket Entry No. 11
(Plaintiff's March 24, 2004, letter to the United States Court of
Appeals for the Third Circuit informing the Court of Appeals that
"two . . . days before [Plaintiff] was to max-out [on] his
sentence[,] the State of New Jersey has moved him . . . to [the
Avenel]."  Moreover, it appears that Plaintiff had numerous
criminal convictions.  See Banda v. NJ Dept. Human Services, 05-
2622 (WJM) (D.N.J.), Docket Entries Nos. 1, 1-2 and 1-3.

[2]  The Court notes, in passing, that the discussion of
Plaintiff's civil litigations provided in this Opinion is a
result of just a brief research, and the Court cannot rule out
the possibility that Plaintiff initiated other federal actions
that the Court's research failed to detect.  Moreover, the Court
has no information as to any state actions initiated by
Plaintiff: although the online information indicates denial of
certification to Plaintiff by the Supreme Court of New Jersey in
State v. Banda,130 N.J. 595 (1992), this Court has no information
as to: (a) whether this ruling was made with regard to
Plaintiff's direct criminal appeal or appeal as to the outcome of
his post-conviction relief proceedings, or with regard to any
civil matter; and (b) whether Plaintiff initiated any other
actions in the state courts that did not reach the Supreme Court
of New Jersey.

(D.N.J.) ("Medford Action").  See id. Docket Entry No. 1.  Since Plaintiff's pleadings were accompanied by his application to proceed in that matter in forma pauperis, Judge Irenas, presiding over the Medford Action, granted Plaintiff in forma pauperis status.  See id. Docket Entries Nos. 1 and 2.  After Plaintiff's pleadings were served upon the defendants, the defendants moved for dismissal of Plaintiff's complaint pursuant to Rule 12(b), asserting lack of jurisdiction or, alternatively, Plaintiff's failure to state a claim upon which relief can be granted.  See id. Docket Entries Nos. 6 and 7.  On June 6, 2000, Judge Irenas granted the defendants' motion dismissing the complaint for failure to state a cognizable claim.  See id. Docket Entries No. 8 and 9.  In sum, less than five months after being commenced, Plaintiff's Medford Action was "stricken" out.[3]

Commenced on April 18, 2000, Plaintiff's litigation in Banda v. Barfield, 00-1851 (JHR) (D.N.J.) ("Barfield Action"), fared no better.  There, Judge Rodrigues similarly granted Plaintiff in forma pauperis status to prosecute his civil rights claims, see id. Docket Entry No. 2, and -- six months later, i.e., on October

---

[3] Since this Court has no certainty as to Plaintiff's prisoner or non-prisoner status at the time of his Medford Action litigation (because, in that matter, Plaintiff provided the Clerk with a civilian mailing address for the purposes of all court communications), the Court is reluctant to qualify Judge Irenas' decision as a "strike" for the purposes of the Prison Litigation Reform Act ("PLRA"), Title VIII of the Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321 (April 26, 1996).

11, 2000 -- dismissed Plaintiff's complaint.  See id. Docket
Entry No. 10.

### 2.    Civil Actions Nos. 02-5610 (JEI)

Two years passed by until Plaintiff initiated his next civil
litigation on October 25, 2002, filing a civil rights complaint
in Banda v. Morgan, 02-5610 (JEI) (D.N.J.) ("Morgan Action").
Same as in his Medford and Barfield Actions, Plaintiff applied
for in forma pauperis status, and duly obtained the same from
Judge Irenas, who presided over this new matter.  See id. Docket
Entry No. 3.  However, right in his order granting Plaintiff in
forma pauperis status, Judge Iranas also dismissed all
Plaintiff's claims except for the one raised against defendant
Friel, with regard to which Judge Irenas directed service.  See
id.

On February 27, 2003, defendant Friel moved, under Rule 12,
for dismissal of Plaintiff's allegations on the grounds of
Plaintiff's failure to state a claim upon which relief may be
granted.  See id. Docket Entry No. 9, see also id. Docket Entry
No. 16 (Plaintiff's letter clarifying the nature of defendant
Friel's response).  However, in light of Plaintiff's application
to file an amended complaint altering the already-dismissed
claims against all other defendants, Judge Irenas granted
Plaintiff leave to amend on March 21, 2003. Within one week, the
amended complaint and Plaintiff's bill of particulars were

docketed, see id. Docket Entries Nos. 21 and 23-24, and – just five days later -- Judge Irenas granted defendant Friel's Rule 12(b) motion and, in addition, dismissed Plaintiff's amended claims against all other defendants sua sponte, citing Plaintiff's failure to state a claim.   See id. Docket Entries Nos. 27 and 28; accord id. Docket Entry No. 30.

After unsuccessfully moving Judge Irenas for reconsideration of that final dismissal, see id. Docket Entries Nos. 30 and 36-37,[4] Plaintiff appealed, also in forma pauperis, to the United States Court of Appeals for the Third Circuit.   See id. Docket Entries Nos. 41 and 42.   The Court of Appeals dismissed Plaintiff's application for lack of jurisdiction.   See Docket Entry No. 49.   Petitioner, then, filed an application for a writ of certiorari with the United States Supreme Court, see id. Docket Entry No. 52, which the Supreme Court denied.   See id. Docket Entry No. 54.   Simply put, Plaintiff's Morgan Action was "stricken" too, just as his prior federal litigations.

### 3.   Civil Actions Nos. 03-2045 (JEI)

On the day when Judge Irenas dismissed Plaintiff's motion for re-reconsideration in the Morgan Action, Plaintiff commenced his next civil rights litigation, Banda v. Burlington County, 03-

---

[4] Apparently not convinced by Judge Irenas' decision, Plaintiff moved for re-reconsideration the next day after Judge Irenas denied his first reconsideration motion.   See Morgan Action, Docket Entry No. 31.   Judge Irenas denied that repeated motion.   See id. Docket Entries Nos. 32 and 33.

2045 (JEI) (D.N.J.) ("Burlington Action").  Same as Plaintiff's prior matters, the Burlington Action was initiated in forma pauperis.  See id. Docket Entries Nos. 1 and 3.  Five and a half months later, Judge Irenas issued an order and accompanying opinion granting Plaintiff in forma pauperis status and, in addition, dismissed all Plaintiff's claims.  See id. Docket Entry No. 3.  Two weeks later, Plaintiff moved for reconsideration, see id. Docket Entry No. 4, which was denied next week.  See id. Docket Entries Nos. 5 and 6.

Proceeding in forma pauperis, Plaintiff appealed Judge Irenas' decision to the Court of Appeals.  See id. Docket Entries Nos. 7 and 10.  On March 3, 2005, the Court of Appeals remanded that matter stating as follows:

> [Plaintiff] filed a civil rights complaint . . . alleging procedural due process violation in the granting by a New Jersey state court of a forfeiture complaint against his property (RV camper) without notice. [Plaintiff] sought compensatory damages, early release from prison . . . , restoration of his driver's license, return of his camper, and to be "left alone by all law enforcement agencies within the state."  At the time [Plaintiff] filed his complaint, the state forfeiture proceedings were ongoing. . . . [T]he District Court granted [Plaintiff] in forma pauperis status and sua sponte dismissed the complaint . . . pursuant to the Younger doctrine [under which] it would not be appropriate for the court to interfere with the ongoing state forfeiture action.  [However,] according to [Plaintiff,] the state forfeiture proceedings are now [i.e., at the time when the appeal was either filed or decided] complete.  Accordingly, abstention is no longer appropriate.  We will therefore . . . remand [the matter] for further proceedings.

Id. Docket Entry No. 19.

On March 22, 2005, Judge Irenas issued an order directing service of Plaintiff's original complaint upon defendants.  _See id._ Docket Entry No. 20.  Twelve days later, the Clerk received Plaintiff's amended complaint, _see id._ Docket Entry No. 22, which the defendants moved to dismiss two weeks later, asserting that Plaintiff was raising claims against defendants immune from suit. _See id._ Docket Entry No. 23.  Plaintiff, in response, moved for declaratory judgment, which was denied by Judge Irenas and caused Plaintiff's filing of an interlocutory appeal.  _See id._ Dockets Entries Nos. 25-28.  Finding no basis to grant him interlocutory appeal, the Court of Appeals denied Plaintiff's application, _see id._ Docket Entry No. 41, and on September 26, 2006, Judge Irenas dismissed Plaintiff's complaint on the grounds that Plaintiff's failure to state a cognizable claim and, in addition, because Plaintiff was suing the defendants immune from suit.  _See id._ Docket Entries Nos. 50 and 51 (clarifying that the decision was granted with regard to defendants' Rule 12(c) motion and conversion of another defendants' motion to dismiss into a motion for summary judgement).

After Judge Irenas denied Plaintiff's motion for reconsideration, _see id._ Docket Entries Nos. 52 and 55, another _in forma pauperis_ appeal followed, _see id._ Docket Entry No. 58, and was dismissed by the Court of Appeals.  _See id._ Dockets Entries Nos. 58, 60 and 60-2 (affirming Judge Irenas' conclusion

and stating that Plaintiff's claims against county defendants
failed to state a claim, while his claims against the prosecutors
were barred by absolute immunity).  In other words, Plaintiff's
Burlington Action was also "stricken" out.

**B.   <u>Actions Commenced During Civil Confinement</u>**

**1.   Civil Actions Nos. 04-5632 (AET)**

It appears that Plaintiff entered civil commitment about the
same time when the Court of Appeals granted him <u>in forma pauperis</u>
status with regard to his first – out of his three – appeals of
Judge Irenas' decision in the Burlington Action.  Ten months
after entering his civil commitment, Plaintiff initiated another
litigation, <u>Banda v. New Jersey</u>, 04-5632 (AET) (D.N.J.) ("New
Jersey I Action"), proceeding <u>in forma pauperis</u>.[5]  <u>See id.</u> Docket
Entry No. 1.

Since Plaintiff's complaint in the New Jersey I Action
asserted that Plaintiff was unlawfully confined at Avenel and
sought monetary damages for this confinement, Judge Thompson
dismissed Plaintiff's claims, pursuant to the holding of <u>Preiser</u>

---

[5] The Court notes that Plaintiff's status as a civilly
committed (rather than as a convicted prisoner) at the time of
his initiation of the New Jersey I Action appears uncertain,
since Judge Thompson, ruling on Plaintiff's application, noted
that Plaintiff's <u>in forma pauperis</u> qualification resulted from
the PLRA, hence suggesting that Plaintiff entered Avenel and, for
a certain period of time, remained there as a criminally
convicted.  <u>See</u> New Jersey I Action, Docket Entry No. 2, at 1-2.
However, for the purposes of this Opinion, this Court presumes
that -- short of his first two days in Avenel -- Plaintiff was
always confined there as a civilly committed individual.

v. Rodriquez, 411 U.S. 475 (1973), and also dismissed his claims against the state under the Eleventh Amendment immunity.  See id. Docket Entry No. 2.

One week later, Plaintiff moved Judge Thompson for reconsideration, see id. Docket Entry No. 4, and --in  one more week, i.e., before Judge Thompson even had a chance to rule on his motion -- filed an in forma pauperis appeal with the Court of Appeals for the Third Circuit, see id. Docket Entry No. 5, which resulted in a stay of Plaintiff's appeal on the grounds of his pending motion for reconsideration.  See id. Docket Entry No. 8. Eventually, Judge Thompson denied Plaintiff reconsideration, see id. Docket Entries Nos. 9 and 10, and the Court of Appeals affirmed.  See id. Docket Entry No. 16-2 (repeating Judge Thompson's explanations and supplementing her discussion of prematurity under Preiser v. Rodriquez with a discussion of Heck v. Humphrey, 512 U.S. 477 (1994)).  Plaintiff's in forma pauperis application to the Supreme Court for a writ of certiorari was similarly denied.  See id. Docket Entries Nos. 17 and 18.  Thus, Plaintiff's New Jersey I Action was "stricken" out, same as Plaintiff's pre-civil commitment federal litigations.

### 2.   Civil Actions Nos. 05-2078 (WJM)

**While he was awaiting the Court of Appeals' ruling as to his** New Jersey I Action, Plaintiff commenced another litigation in this District, i.e., Banda v. NJ Special Treatment Annex, 05-2078

(WJM) (D.N.J.) ("Special Treatment Annex Action").   Proceeding, again, in forma pauperis, Plaintiff submitted a forty-page complaint effectively replicating his dismissed-by-Judge-Thompson-and-then-pending-on-appeal challenges raised in the New Jersey I Action.   See id. Docket Entry No. 5, at 1-3 (discussing the similarities between the complaints).   Presiding over Plaintiff's Special Treatment Annex Action, the undersigned granted Plaintiff in forma pauperis status and dismissed the complaint on the grounds substantively identical to those already articulated to Plaintiff by Judge Thompson.   See id.

     One week after this Court dismissed Plaintiff's complaint in the Special Treatment Annex Action (which was one month after the Court of Appeals' affirmance of Judge Thompson's decision), Plaintiff appealed this Court's decision to the Court of Appeals proceeding, again, in forma pauperis.   See id. Docket Entry No. 8.   Not surprisingly, the Court of Appeals registered Plaintiff's appeal of this Court's ruling as duplicative of his appeal in the New Jersey I Action, see id. Docket Entry No. 10, and dismissed Plaintiff's appeal of this Court's decision in the Special Treatment Annex Action as frivolous.   See id. Docket Entry No. 13.   In sum, Plaintiff incurred another "strike."

### 3.   Civil Actions Nos. 05-2622 (WJM)

     But even before this Court had an opportunity to rule on Plaintiff's Special Treatment Annex Action, Plaintiff already

generated another civil litigation, i.e., Banda v. NJ Dept. Human Services, 05-2622 (WJM) (D.N.J.) ("Human Services Action"), by submitting a fifty-three page complaint and, as always, an in forma pauperis application. See id. Docket Entry No. 1. The complaint, naming fourteen defendants ranging from the New Jersey Department of Human Services to staff of Avenel, essentially re-alleged the claims raised in the New Jersey I Action and Special Treatment Annex Action. See id. Docket Entries Nos. 1, 1-2 and 1-3. This Court, therefore, re-explained to Plaintiff, once again, the concept of prematurity (ensuing from the holdings of Preiser v. Rodriguez and Heck v. Humphrey) and dismissed this new complaint while allowing Plaintiff to proceed in forma pauperis. See id. Docket Entries Nos. 3 and 4.

One week after that dismissal, Plaintiff filed an in forma pauperis appeal, see id. Docket Entry No. 5, causing the Court of Appeals to register this new appeal as another duplicative application, which, too, was dismissed as frivolous. See id. Docket Entries Nos. 8 and 11. Simply put, Plaintiff got himself yet another "strike."

### 4. Civil Actions Nos. 05-3183 (JAG)

While the Human Services Action was still pending before this Court, Plaintiff already initiated a habeas litigation in Banda v. New Jersey, 05-3183 (JAG) (D.N.J.) ("New Jersey II Action"), see id. Docket Entry No. 1, where Plaintiff duly

prepaid his filing fee of $5.00.  <u>See</u> Docket Entry No. 1.

Although Plaintiff challenged his civil commitment and sought immediate release, his petition in the New Jersey II Action facially indicated that it was unexhausted in the state courts.  <u>See id.</u> Docket Entry No. 1.  Therefore, Judge Greenaway, presiding over the New Jersey II Action, dismissed the petition as unexhausted and declined to issue a certificate of appealability.  <u>See id.</u> Docket Entries Nos. 2 and 3.  Plaintiff then informed Judge Greenaway that his state challenges were pending with the Superior Court of New Jersey, Appellate Division, and requested six- to twelve-month stay of his petition.[6]  <u>See id.</u> Docket Entries Nos. 4-7.  Finding that Plaintiff's statute of limitations for the purposes of the Anti-Terrorism and Effective Death Penalty Act had not even begun to run, Judge Greenaway denied Plaintiff's request.  <u>See id.</u> Docket Entries Nos. 7 and 8.

### 5.   Civil Actions Nos. 06-093 (PGS)

While still seeking a stay from Judge Greenaway with regard to his New Jersey II Action, and already having the benefit of

---

[6] The Court notes, in passing, that although Plaintiff asserted that, at the Appellate Division level, the action was registered as <u>In the matter of civil commitment of JMB SVP</u>-358-04, Docket No. A-006458-03T2 notice (N.J. Super. Ct. App. Div.), this Court's online research failed to locate any record of this proceeding.  However, the Court's inability to locate such records is not necessarily dispositive as to the issue of actual existence of Plaintiff's state proceedings.

this Court, Judge Thompson and the Court of Appeals' guidance as to his claims raised in the Human Services Action, Special Treatment Annex Action and New Jersey I Action, Plaintiff produced another litigation, Banda v. McGreevey, 06-093 (PGS) (D.N.J.) ("McGreevey Action"), by filing a hundred-thirty-one page civil rights complaint naming forty defendants, which arrived accompanied by his application to prosecute these new action in forma pauperis. See id. Docket Entry No. 1.

The complaint in the McGreevey Action re-stated, once again, Plaintiff's claims raised and re-raised in the Human Services Action, Special Treatment Annex Action and New Jersey I Action, i.e., the very claims that were already thrice dismissed in this District and, in addition, thrice dismissed by the Court of Appeals. See id. Docket Entry No. 6, at 5-7. In addition to the foregoing, Plaintiff also claimed denial of access to the courts by asserting that he was "deprived of photocopying," without clarifying whether this lack of photocopies ever yielded any actual injury. See id. at 7-10.

Judge Sheridan, presiding over the McGreevey Action, granted Plaintiff in forma pauperis status and dismissed Plaintiff's access-to-the-courts claims with prejudice and the claims duplicative of those raised in the Human Services Action, Special Treatment Annex Action and New Jersey I Action on the grounds already explained and re-explained to Plaintiff by this Court,

Judge Thompson and the Court of Appeals.  See id. Dockets Entries
Nos. 6 and 7.  After Plaintiff moved for reconsideration, see id.
Docket Entries Nos. 10-12, Judge Sheridan denied his motion on
December 13, 2006.  See id. Docket Entry No. 13.  All in all, it
was one more "strike" for Plaintiff.

### 6.    Civil Actions Nos. 07-869 (KSH)

Three months passed, and then Plaintiff commenced his next
litigation, see Banda v. Brown, 09-869 (KSH) (D.N.J.) ("Brown
Action"), by filing a fifty-four page complaint naming twenty-six
defendants.  In this complaint, Plaintiff reiterated, once again,
the claims raised in his McGreevey Action, Human Services Action,
Special Treatment Annex Action and New Jersey I Action.  See id.
Docket Entry No. 6.  Together with his complaint, Plaintiff
submitted his in forma pauperis application, see id. Docket Entry
No. 1, and followed that submission with a partial filing fee of
$150.00, see id. Docket Entry No. 3, as well as with an inquiry
as to why he should pay $200 more.[7]  See id. Docket Entry No. 4.
Judge Hayden, presiding over Plaintiff's Brown Action granted him
in forma pauperis status and dismissed his claims as duplicative
of Plaintiff's prior actions, reiterating to Plaintiff what was
already explained to him seven times by this Court, Judges

---

[7]  The best this Court can surmise is that Plaintiff was not
aware of the 28 U.S.C. § 1914(a) changes.  The $250.00 filing fee
requirement of 28 U.S.C. § 1914(a) took effect on February 7,
2005, and, on April 9, 2006, the filing fee increased from
$250.00 to $350.00.

Thompson and Sheridan and the Court of Appeals.  See id. Docket
Entries Nos. 5 and 6.  As with all his cases, Plaintiff moved for
reconsideration, see id. Docket Entries Nos. 8 and 9, which Judge
Hayden denied on October 31, 2007.  See id. Docket Entry No. 11.
In other words, Plaintiff earned himself one more "strike."

### 7.   Civil Actions Nos. 07-4508 (WJM)

While Plaintiff's motion for reconsideration as to his Brown
Action was still pending before Judge Hayden, Plaintiff already
orchestrated another litigation, Banda v. Corzine, 07-4508 (WJM)
(D.N.J.) ("Corzine Action").  See id. Docket Entry No. 1. Since,
in many respects, the Corzine Action was far more concerning than
Plaintiff's flood of prior submissions, the procedural and
substantive aspects of the Corzine Action warrant a thorough
discussion.

Unlike Plaintiff's prior submission, the complaint in the
Corzine Action arrived labeled with a heading "class action,"
suggesting that Plaintiff self-certified a class consisting of
himself and fifteen other civilly committed individuals at
Avenel, whom he named as his co-plaintiffs.  See id. Docket Entry
No. 1, at 1.  The complaint named, as defendants, the governor,
then-acting Commissioner of New Jersey Department of Corrections,
New Jersey Attorney General, four Avenel officials, one hundred
John/Jack/Jane/Joan Doe (identified merely as corrections
officers or Public Advocates employed by the State of New Jersey)

and a John Doe identified as the "Regional Commander of

Department of Corrections." See id.

Notably, all plaintiffs named in the Corzine Action

submitted absolutely identical in forma pauperis applications,

each of which included the following statement, framed by strings

of asterisks,

> Attention to the Court: Please be advise[d] that the
> above[-]named Plaintiff is involuntary civilly
> committed[,] and that He is No-Longer a Prisoner[,] &
> that He IS NOT required to comply with the P.L.R.A.
> requirements.

See, e.g., Docket Entry No. 1-15 (replicating Plaintiff's in

forma pauperis application) (capitalization and symbol "&" in

original).

Since the complaint stated a potpourri of allegations not

suitable for class action or even joinder, this Court denied

certification and severed challenges by Plaintiff's fifteen co-

plaintiffs into separate actions (that were assigned, on the

wheel, among the Judges in this District), reserving the Corzine

Action for Plaintiff himself. See id. Docket Entries Nos. 3 and

4.

Stripped from allegations related to co-plaintiffs,

Plaintiff's challenges raised in the Corzine Action could be

summarized as follows: (1) Plaintiff's rights were violated

because, on a certain day when the entire Avenel facility was

searched for controlled substances, Plaintiff was directed to

walk out into the yard in a line composed of all other Avenel inmates; (2) Plaintiff's rights were violated because, after that, Plaintiff was pat-searched and served with a half-a-cup of water, and then re-served with water on half-an-hour to hourly basis during his three-to-four-hour stay in the yard, which Plaintiff found insufficient; Plaintiff was also displeased with the water being chilled less than he would prefer; (3) Plaintiff's rights were violated because, three-to-four hours later, the entire Avenel population was returned to the facility but served lunch in groups rather than as a single masse; (4) Plaintiff's rights were violated because he experienced a sense of intimidation watching the search by officials who were allowed to keep their weapons; (5) Plaintiff's rights were violated because, upon his return from the yard, the access to bathrooms was denied to all inmates for about five minutes, and access to showers was denied for about ten minutes; (6) Plaintiff's rights were violated because, after the time he spent in the yard, Plaintiff felt that his eyes were "puffy" and, three days later, decided to ask for (and received) a sunburn-soothing lotion for his forehead and nose; (7) Plaintiff's rights were violated because he became concerned that the sun exposure he had during these hours in the yard might eventually cause him cancer; and (8) Plaintiff's rights were violated because the Attorney General and the New Jersey Public Advocates did not sue Avenel officials,

the governor and the then-acting Commissioner for all of the above.  See id. Docket Entry No. 1.

Dismissing Plaintiff's claims, this Court detailed to Plaintiff the legal tests applicable to respondeat superior claims, claims against non-supervising officials having no involvement in the alleged wrongs, as well as the legal tests determining the sufficiency of Fourth and Fourteenth Amendment claims dealing with searches, conditions of confinement, harassment, medical care, etc., and explained to Plaintiff, inter alia, that spending a few hours outside on a summer morning, when the temperature varied from 72 to 84.5 degrees, with 61 percent humidity, no precipitation and mild wind, all while being served water and then timely invited for lunch, could not amount to a hardship of constitutional magnitude.  See id. Docket Entry No. 3. Turning to Plaintiff's litigation practices, the Court stated:

> It is well within the broad scope of the All Writs Act, 28 U.S.C. § 1651(a), for a district court to issue an order restricting the filing of meritless cases by a litigant whose manifold complaints aim to subject defendants to unwarranted harassment, and raise concern for maintaining order in the court's dockets.  See e.g., In Re Oliver, 682 F.2d 443, 445 (3d Cir. 1982) (citing Lacks v. Fahmi, 623 F.2d 254 (2d Cir. 1980) (per curiam); Harrelson v. United States, 613 F.2d 114, 115 (5th Cir. 1980) (per curiam); Clinton v. United States, 297 F.2d 899, 901 (9th Cir. 1961), cert. denied, 369 U.S. 856 (1962)).  The Court of Appeals for the Third Circuit guided that,
>
> > [i]n appropriate circumstances, courts have gone beyond prohibitions against relitigation and enjoined persons from filing any further claims of any sort without the permission of the court.  In Rudnicki v. McCormack, 210 F. Supp. 905 (D. Mass. 1962), the court entered such an

injunction after it found that, in the absence of a
court-ordered proscription, a plaintiff who had
"repeatedly filed groundless actions" against various
state and federal officers will continue to institute
groundless and purely vexatious litigation both against
these defendants and against other judges and public
officials, the effect of which will be to cause further
harassment of these officials, further expense to the
governments which they represent, and further burden
upon the offices of the clerks of the courts in which
such proceedings are initiated. Id. at 911. See also
Gordon v. U.S. Department of Justice, 558 F.2d 618 (1st
Cir. 1977) (plaintiff enjoined from instituting suit
against any state or federal judge, officer, or
employee without permission of court); Green v. Wyrick,
428 F. Supp. 732 (W.D. Mo. 1976).

Oliver, 682 F.2d at 445. Plaintiff . . . enjoyed a
substantial legal history in this District . . . and had all
these actions dismissed . . . with appeals, applications for
certiorari and applications for rehearing denied. . . . In
sum, it appears that Plaintiff . . . used his imprisonment
and civil confinement to entertain himself through drafting
voluminous legal submissions bearing a vague appearance of
legal documents but having no merit. Hence, Plaintiff . . .
is not merely one of the "litigation engines" [--] he is a
"recreational litigant," i.e., the "one who engages in
litigation as sport and files numerous complaints with
little regard for substantive law or court rules." Jones v.
Warden of the Stateville Correctional Ctr., 918 F. Supp.
1142, 1153 (N.D. Ill. 1995) (. . . noting that, "[w]hen
confronted with [a] recreational plaintiff, courts, to
protect themselves and other litigants, have enjoined the
filing of further case without leave of court," and citing
In re Winslow, 17 F.3d 314 (10th Cir. 1994); In re Burnley,
988 F.2d 1 (4th Cir. 1992); and Mayfield v. Collins, 918
F.2d 560 (5th Cir. 1990)). This impression that Plaintiff .
. . is a recreational litigant is particularly supported by
(a) the fact that, [on the day of the search,] Plaintiff . .
. began taking painstaking up-to-the-minute notes of the
events right from the moment when the first [Avenel] officer
appeared in [there] at 8:25 A.M. (i.e., before the [inmates]
were even removed to the recreation yard and long before
[they] discovered that they might have to remain in the yard
for a few hours . . . ; and (b) Plaintiff . . . intentional
capitalization on the fact that the requirements of [the
PLRA] are inapplicable to involuntarily civilly-committed
violent sexual predators like himself [because his in forma

pauperis application, as well as his complaint emphasize, by
an]  asterisked box opening with the "ATTENTION TO THE
COURT" entry, in capital letters, [that] Plaintiff [is]
exempt from the limitations of the PLRA. . . .  Since it
appears that Plaintiff['s] ability to keep filing meritless
legal actions, if not curtailed, is likely to enable
Plaintiff . . . to (a) unduly "piggy-back" on potentially
valid claims by other [litigants], (b) exert undue . . .
influence over other [inmates] who might have preferred not
to prosecute a legal action of any kind, or might have
elected to set forth a claim of factual or legal nature
different from that selected by Plaintiff . . . , (c)
groundlessly harass [government] officials . . . , and (d)
prey, without any valid reason, on this District's limited
resources by taking an undue advantage of the narrow scope
of the PLRA, this Court concludes that adoption of certain
preventive measures is warranted in order to protect this
District, government officials, as well as [Plaintiff's co-
inmates], from Plaintiff['s] passion for recreational
litigation.

Id. Docket Entry No. 3, at 53-56 (footnotes omitted).[8]

The Court, therefore, entered a modest limitation on

Plaintiff's ability to initiate non-habeas civil litigation in

this District by directing as follows:

this Court will enjoin the Clerk . . . from [filing]
pleadings in which Plaintiff . . . is designated as a pro se
in forma pauperis plaintiff, unless leave is first obtained
from the Court upon establishing that the submission
presents, at the very least, a non-frivolous colorable
argument for the requested relief.  In seeking [such] leave
of Court, Plaintiff . . . must certify in writing that (a)

---

[8] This Court's concerns proved to be well-founded.  See
Haines v. Does, 07-5387 (SRC), 2008 U.S. Dist. LEXIS 30652, *8
(an action that came about upon this Court's severance of
Plaintiff's co-plaintiffs' claims into separate matters, where
one of Plaintiff's co-plaintiffs sent a letter to Judge Chesler
confirming that Plaintiff was the architect and the draftor of
of the Corzine Action original "class action" complaint and
unduly abusing his litigation experience by effectively hijacking
litigations of other inmates).

> the claims he wishes to present are new claims never before
> raised and disposed on merits by any federal court, (b) he
> believes the facts alleged in his proposed complaint to be
> true, and (c) he knows of no reason to believe his claims
> are foreclosed by controlling law. . . . Plaintiff . . . is
> expressly cautioned against attempting to circumvent this
> measure by . . . mislabeling his civil rights applications
> as . . . habeas applications [since such measure would be an
> abuse of the writ]. . . . [A]ll Plaintiff['s] submissions,
> either <u>pro</u> <u>se</u> or represented, should be filed if these
> submissions are accompanied by the applicable filing fee.

<u>Id.</u> at 57 and n.30.  The Court issued its opinion and an order to

that effect on November 1, 2007.  <u>See</u> <u>id.</u> Docket Entries Nos. 3

and 4.  Six weeks later, the Clerk received a package from

Plaintiff.[9]  <u>See</u> <u>id.</u> Docket Entry No. 6.  The package was

> consisting of: (a) a cover letter . . . asserting that he
> had never received copies the [Court's] Order and . . .
> Opinion [which contradicted the statements made in
> Plaintiff's November 15 letter] and (b) the document titled
> . . . "Amended Complaint," even though [Plaintiff's]
> original [claims were] dismissed with prejudice and, hence,
> he was not allowed to submit such a document.  <u>See</u> Docket
> Entry No. 6.  In addition, [Plaintiff] submitted his an
> application for appointment of <u>pro</u> <u>bono</u> counsel.  <u>See</u> <u>id.</u> at
> 9-13.  Consequently, this Court: (a) construed [Plaintiff's]
> "Amended Complaint" as a motion for reconsideration of this

_____

[9] In addition, on November 15, 2007, Plaintiff executed a
letter to the Clerk stating that he "underst[ood] that there
[was] a problem on the way that [he was] submit[ing]/fil[ing] his
complaints" and asking to "allow [him] to explain himself."
Corzine Action, Docket Entry No. 5.  Plaintiff's explanation
consisted of a four-page single-spaced wholly irrelevant
statements ending with the request to the Clerk to "[p]lease be
advised, and please inform the Court that 'WE THE PEOPLE OF THE
UNITED STATES ARE SICK & TIRED OF GETTING RUN AROUND' in getting
any kind of justice done in this Court, to which Plaintiff asks
for a change of venue [in this already terminated case] in having
[h]is case heard, for it is obvious [to Plaintiff] that [he]
cannot get any kind of justice in this Court of any type matter."
<u>Id.</u> Docket Entry No. 5, at 4 (capitalization and symbol "&" in
original).

> Court's [dismissal] order [and, in an order directing
> reopening of the Corzine Action,] clarified the scope of the
> preclusion . . . entered against [Plaintiff] for the
> purposes of [his] future filings with this District.[10]

Id. Docket Entry No. 8, at 4-5 (summarizing the content of

Plaintiff's package and this Court's corresponding actions).

Then, turning to the merits of the documents included in

Plaintiff's package, the Court found that vacatur of this Court's

decision dismissing the Corzine Action was not warranted.   See

id. Docket Entries Nos. 8 and 9;[11] accord Pena-Ruiz v. Solorzano,

281 Fed. App'x 110, 111 n.1 (3d Cir. 2008) (clarifying that a

district court's reconsideration of its previous decision

---

    10   See Corzine Action, Docket Entry No. 7, n. 1 (where -- in
response to Plaintiff's statement that he intends to file a
habeas petition and his question, "Does he need to ask the Court
for permission for filing that too???" -- the Court re-explained
to Plaintiff that the preclusion did not affect Plaintiff's
ability to initiate true habeas proceedings).

    11 The Court's opinion denying vacatur detailed and discussed
invalidity of all claims stated in Plaintiff's amended complaint
turned into motion for reconsideration.   See Corzine Action,
Docket Entry No. 8 (noting that Plaintiff's new claims consisted
of: (a) generic proclamations expressing Plaintiff's apparent
displeasure with the existing legal regime, under which
Plaintiff's complaints kept being dismissed; (b) statements like
"[t]here is nothing therapeutic about the unprofessional errors
of judgement & gross negligence that was display[ed] toward
[Plaintiff and Avenel officials have no] authority to mis[]treat
[Plaintiff] as 'Lesser Breeds' or 'State Prisoners' by ordering,
enforcing and carrying out the unprofessional errors of judgement
& gross negligence orders"; (c) disagreement with this Court's
conclusion that a violation of constitutional magnitude cannot be
found when the frequency of re-servings and chillness of water
did not meet Plaintiff's preferences; and (d) an insufficient and
not-new-evidence allegation that Plaintiff might have been
displeased with the need to wait on line to use a bathroom placed
in the Avenel yard during the time of the search).

qualifies as a grant of motion for reconsideration if the
reconsideration is conducted on merits, regardless of whether or
not the district court arrives, upon such reconsideration, at a
conclusion identical to that previously reached or vacates its
prior ruling).  When, on January 3, 2008, the Court issued an
order and accompanying opinion to that effect, the Clerk duly
served copies of the same upon Plaintiff.  Yet, on January 16,
2008, the Clerk received another letter from Plaintiff asserting
that Plaintiff was still unclear as to the scope of preclusion
entered against him and indicating Plaintiff's intent to initiate
another civil action stating challenges duplicative to those
dismissed and re-dismissed by this Court, Judges Thompson, Hayden
and Sheridan, and by the Court of Appeals, in his Brown Action,
McGreevey Action, Human Services Action, Special Treatment Annex
Action and New Jersey I Action.  <u>See</u> Docket Entry No. 10.

     Giving Plaintiff the benefit of the doubt as to his
confusion about the scope of preclusion, the Court issued one
more opinion and order explaining to Plaintiff that he cannot
keep re-litigating the already adjudicated claims, <u>see id.</u> Docket
Entry No. 13, at 5-6, and, in addition, guiding Plaintiff as
follows:

          [A] civil rights complaint submitted, is deemed merely
          "received" but not filed . . . . Plaintiff, if he wishes to
          ensure that the Clerk is granted leave to file Plaintiff's
          submission, . . . shall submit: (a) a complaint (which
          should be a clear and concise statement of relevant facts
          indicating that Plaintiff is entitled to relief, rather than

a diary-like account or a bunch of pages filled with empty
rhetoric, accusatory epithets and Plaintiff's bald
conclusions); (b) a completed application to proceed in
forma pauperis; (c) and a written certification stating that
(i) the claims he wishes to present are new claims never
before raised and disposed on merits by any federal court,
(ii) he believes the facts alleged in his proposed complaint
to be true, and (iii) he knows of no reason to believe his
claims are foreclosed by controlling law.  Upon examination
of this submission, the Court would decide as to whether
[to] file the submission.  The Court notes that the doors of
federal courts are always open to all litigants, including
indigent ones, who bring claims that they believe,
reasonably and in good faith, to be meritorious.  However,
being guardians of the sanctity of the legal process, the
courts protect the process from those litigants who seek to
hijack the process for the purpose of pure pestering of
their victims, whom they name as defendants, or who treat
litigation as a game or as a basis for their bravado, or who
commit fraud on court or otherwise act in a fashion
disentitling them from relief. . . . In view of the
foregoing, the Court strongly encourages Plaintiff to: (a)
treat every submission Plaintiff makes to this District, or
any other state or federal court, with utmost degree of
seriousness; (b) study, for guidance, the multitude of legal
decisions entered, with respect to Plaintiff's previous
applications, by the Court of Appeals, as well as by the
judges in this District, including the undersigned, with
great degree of care, and do such studying prior to
preparation of Plaintiff's legal submissions; and (c)
execute his applications in the manner indicating that
Plaintiff took notice of the guidance provided in the
Court's previous Orders, as well as in the instant Order.
Being well aware of the peculiarities associated with
prison--or civil commitment--environment, this Court is
gravely concerned that, at the instant juncture, Plaintiff
has so qualified himself socially to his peers that
Plaintiff, somehow, feels obligated to continue
manufacturing endless legal suits and/or letters to the
courts in order to maintain his "social status of an
aggressive litigant."  If so, and in view of potentially
very serious and detrimental consequences that such
litigation practice might entail, the Court urges Plaintiff
to consider "re-qualifying" himself into someone who aims to
achieve the highest legal quality--rather than mere
quantity--of his legal actions.

Id. at 3-7 and n.2.

Alas, as the history of Plaintiff's following litigations shows, this Court's guidance fell on a deaf ear.

### 8.   Civil Actions Nos. 08-3484 (JAG)

On February 16, 2008, the Clerk served Plaintiff this Court's latest order and opinion in the Corzine Action.  See id. Docket Entry No. 14.  On July 14, 2008, that is, five months later, the Clerk received another civil complaint from Plaintiff, accompanied by his in forma pauperis application.  See Banda v. Main, 08-3484 (JAG) D.N.J.) ("Main Action").  In this new complaint, Plaintiff asserted that he was denied access to the courts and attached, without any clarification, three requests for law library materials by Plaintiff dated May 17, 2008, May 17, 2008, and May 22, 2008.  See id. Docket Entry No. 2, at 1 (summarizing Plaintiff's substantive submission).   In addition, Plaintiff submitted a cover letter reading:

> It is to my understanding that any New complaints that I submit and file to Your Courthouse, I am suppose[d] to notify You if it will be a New Complaint or not. **Please be advised** that this enclosed and/or attached Complaint is a **New Complaint,** it has nothing to do with any of the other Complaints that this Plaintiff has submitted previously.

Id. Docket Entry No. 1-2, at 4 (capitalization, bolding and underscore in original).

Judge Greenaway, presiding over the Main Action, administratively terminated the matter, explaining that

> This Court will administratively terminate the action without filing the Complaint or ruling on Plaintiff's application to proceed in forma pauperis because

> Plaintiff has not complied with [the preclusion order].
> That [o]rder enjoins the filing of an action by
> Plaintiff "in his capacity of a pro se in forma
> pauperis plaintiff while asserting a civil rights
> violation, unless leave is first obtained from the
> Court upon establishing that the submission presents,
> at the very least, a non-frivolous colorable argument
> for the requested relief." . . . The [preclusion order]
> further specifies that "[i]n seeking leave of Court,
> Plaintiff . . . must certify in writing that (a) the
> claims he wishes to present are new claims never before
> raised and disposed on the merits by any federal court,
> (b) he believes the facts alleged in his proposed
> complaint to be true, and (c) he knows of no reason to
> believe his claims are foreclosed by controlling law."
> . . . [T]his Court will enter an order reopening the
> case if, within 30 days of the date of the entry of
> this Order, Plaintiff complies with the [requirements
> of his preclusion order] by seeking and obtaining leave
> of this Court in the manner set forth in the
> [preclusion order].

Id. Docket Entry No. 2.

In response, Plaintiff sent Judge Greenaway an eight-page letter wholly silent as to the requirements of the preclusion order.[12]   See id. Docket Entry No. 3.  The Main Action, therefore, remained administratively terminated for Plaintiff'as failure to comply with the requirements of this Court's preclusion order.

_____

[12] This development was hardly surprising, since Plaintiff's letter to Judge Greenaway indicated that Plaintiff's interest in library material was based on his desire to "learn more about real estate" and, thus, Plaintiff could not assert, in good faith, that he was denied assess to the courts and suffered actual injury in connection with an actual litigation by denial of library material: he indeed knew that his claims were foreclosed by controlling law because the standard applicable to access-to-the-courts claims was already explained to him, at nauseam, by Judge Sheridan in Plaintiff's McGreevey Action.

### 9.   Civil Actions Nos. 08-3542 (DMC)

Just one day after he initiated his Main Action,
Plaintiff commenced his next litigation, Banda v. Trulonie,
08-3542 (DMC) (D.N.J.) ("Trulonie Action"), by submitting
another complaint and another in forma pauperis application.
See id. Docket Entry No. 1.  The complaint asserted that a
nurse at Avenel denied Plaintiff's request for a certain
prescription medication, and the accompanying cover letter
read, just as in his Main Action,

> It is to my understanding that any New complaints that
> I submit and file to Your Courthouse, I am suppose[d]
> to notify You if it will be a New Complaint or not.
> **Please be advised** that this enclosed and/or attached
> Complaint is a **New Complaint,** it has nothing to do with
> any of the other Complaints that this Plaintiff has
> submitted previously.

Id. Docket Entry No. 1-4 (capitalization, bolding and
underscore in original).

Judge Cavanaugh, presiding over Plaintiff's Trulonie
Action, administratively terminated that matter on the
grounds identical to those employed by Judge Greenaway in
the Main Action and, same as Judge Greenaway, Judge
Cavanaugh informed Plaintiff that his Trulonie Action would
be reopened upon Plaintiff's compliance with the
requirements of the preclusion order.  See id. Docket Entry
No. 2.  However, and regardless of Plaintiff's having
extremely detailed guidance from this Court as to the legal

test applicable to medical care claims raised under the
Fourteenth Amendment (provided to him time and again during
the course of the Corzine Action), Plaintiff did not cure
the deficiencies of his application, leaving the Trulonie
Action in permanent administrative termination.

### 10.   Civil Actions Nos. 08-5115 (NLH)

Instead of curing the deficiencies of his complaints in
the Main Action and Trulonie Action, Plaintiff -- who, by
that time, was moved to a Special Treatment Unit in Kearny,
New Jersey -- commenced another civil rights litigation,
Banda v. Camden County Board of Chosen Freeholders, 08-5115
(NLH) (D.N.J.) ("Freeholders Action"), doing so just two
months after Judge Cavanaugh administratively terminated the
Trulonie Action.   See id. Docket Entry No. 1.

The original complaint (a thirty-one page production,
which arrived, as all Plaintiff's civil rights submissions,
accompanied by Plaintiff's in forma pauperis application),
see id., was superceded, on the very day it was docketed, by
Plaintiff's amended complaint and then re-superceded, two
weeks later, by Plaintiff's re-amended complaint.   See id.
Docket Entries Nos. 1-3.   In his series of complaints
submitted in the Freeholders Action, Plaintiff asserted
three groups of claims, namely: (1) claims against his
prosecutors and public defender for, allegedly, falsely

stating in -- or acquiescing to -- his pre-sentence report, which indicated that his crimes included a sex offense; (2) claims asserting that his civil commitment is illegal and seeking monetary damages for that commitment; and (3) claims against the Freeholders for either not initiating a suit to release Plaintiff or for simply allowing Plaintiff to remain in commitment.  See id.  Plaintiff's submission arrived by a cover letter stating, inter alia:

> Again, **Please be advised** that this Complaint is a **New Complaint**, and that it has nothing to do with any previously filed Complaints.  In meaning that this particular **NEW Complaint** is addressing a NEW incident of which are NEW claims that has never been before raised and disposed of on its merits by any Federal Court . . . and this Plaintiff knows of **NO reason** that His claims in His **NEW Complaint** are foreclosed by controlling law . . . .

Id. Docket Entry No. 1-2 (capitalization, bolding and underscore in original).

It appears that Judge Hillman, presiding over the Freeholders Action, found Plaintiff's claims against his prosecutors and public defendant sufficiently distinct from the claims adjudicated in Plaintiff's previous actions[13] and, thus,

---

[13] It is self-evident that Plaintiff's averment as to lack of his knowledge about invalidity of his second and third groups of claims was false, since: (a) the third group of claims repeated the Heck-barred challenges already dismissed and re-dismissed by this Court, Judges Thompson, Hayden and Sheridan, and by the Court of Appeals, in his Brown Action, McGreevey Action, Human Services Action, Special Treatment Annex Action and New Jersey I Action; and (b) his second group of claims, i.e., the claims against the Freeholders for their alleged inaction are

granted Plaintiff in forma pauperis status and allowed filing of
Plaintiff's complaint.  See id. Docket Entry No. 4.  However,
Judge Hillman dismissed Plaintiff's due process allegations
against these defendants for failure to state a claim and, same
as this Court, Judges Thompson, Hayden and Sheridan, and the
Court of Appeals, dismissed Plaintiff's Heck-barred claims as
premature.  See id. Docket Entries Nos. 3 and 4.

     As always, Plaintiff filed a motion for reconsideration,
which Judge Hillman denied.  See Docket Entries Nos. 6-8.  In
response, Plaintiff sent a letter to Judge Hillman informing him
that Plaintiff "objects" to Judge Hillman's reasoning and that
"we the people of the United States are sick and tired of all the
unjust, fundamental unfairness, and the miscarriage of justice
that is being given & displayed to its people when a claim is
being brought against state and/or its county."  Id. Docket Entry
No. 9.

### 11.  Instant Litigation, Civil Actions Nos. 09-2723

     Judge Hillman terminated Plaintiff's Freeholder Action on
May 29, 2009.  See id. Docket Entry No. 8.  Five days later,
Plaintiff commenced the instant matter by submitting a twenty-
three page complaint, an in forma pauperis application and a

---

substantively identical to his claims against the New Jersey
Public Advocates dismissed by this Court in the Corzine Action on
the grounds of lack of personal involvement of these defendants
in the alleged wrong.

cover letter.  See Banda v. Otino, 09-2723 ("Otino Action" or
"Instant Matter"), Docket Entry No. 1.  The cover letter
effectively repeated the statement made by Plaintiff with regard
to his Freeholders Action, i.e., it stated:

> Please be advised that this complaint is a new complaint,
> that it has nothing to do with any previously filed
> complaints.  In meaning that this particular new complaint
> is addressing a newly discovered incident of which are new
> claims that has never been before raised and disposed of on
> its merits by any federal court . . . [P]laintiff knows of
> no reason to believe that his claims in his new complaint
> are foreclosed by controlling law.

Id. Docket Entry No. 1-2, at 2.

Describing the content of the complaint submitted in the
Instant Matter, this Court observed that

> [t]he "Statement of Claims" part of Complaint consists of
> forty-one paragraphs, jointly composing ten pages of single-
> spaced narrative (laced with Plaintiff's observations such
> as "that kitchen worker was lying out [of] her ass"), which
> express Plaintiff's displeasure with various events and
> statements made to Plaintiff.  See Docket Entry No. 1, at 8-
> 17.  The list of Defendants, however, names only five
> individuals and [states] that these individuals "refused to
> give this Plaintiff his property (word processor)."  Id. at
> 4-7.  Finally, the "Relief" part of the Complaint (laced
> with Plaintiff's observations that the officials employed at
> his place of confinement are "arrogant, arbitrary, tyrant,
> autocrastic [sic.], dictatorship") requests return of the
> photographs of Plaintiff's son, Plaintiff's word processor
> and TV, [monetary dameges] and his relocation to a first
> floor "room that has cable hook for his T.V."  Id. at 18.

Id. Docket Entry No. 3, at 1.

In light substantive invalidity of Plaintiff's new
allegations, this Court: (a) denied filing of Plaintiff's
complaint and directed the Clerk register is merely as

"docketed"; (b) explained to Plaintiff, once again, the short and plain statement requirement posed by Rule 8; (c) clarified to Plaintiff that his claims for return of property are barred by the New Jersey Tort Claims Act and spelled out the reasons why; and (d) explained to Plaintiff that the United States Constitution provides him with no due process interest in a room with a cable television access.  See id. at 2-3.  In order to emphasize to Plaintiff that his Otino Action was being terminated without leave to reopen and that Plaintiff's complaint is not being filed, and his in forma pauperis application was not being even considered, the Court issued not an order but a "Notice to the Clerk in Lieu of Order."  Id.

Paramountly here, no language included in this Notice suggested, even vaguely, that the Otino Action might be reopened or that Plaintiff could cure the deficiencies of his submission by amending his complaint or by executing separate complaints against defendants.  See id.  Finally, in hope that Plaintiff might still develop a sufficient degree of self-control and start considering his future litigations carefully and in light of the guidance provided to him during his fifteen -- invariably dismissed, at both trial and appellate levels, -- actions commenced in this District, this Court informed Plaintiff that Plaintiff would be deemed charged with knowledge of all legal guidance provided to him for the purposes of all his future

certifications asserting that his complaints are not barred by controlling legal principles.  <u>See id.</u> at 3.

Unfortunately, this Court's desire to credit Plaintiff with an ability to exercise any self-restrain as to his litigation impulses was, once again, unwarranted since, less that two weeks after the Clerk terminated the Instant Matter, Plaintiff sent this Court a letter informing the Court that Plaintiff intends "to file a complaint for each defendant [named and unnamed in the Otino Action.  Plaintiff, therefore] requests 5 <u>pro se</u> litigants instructions along with change of venue forms (5)."  <u>Id.</u> Docket Entry No. 4.[14]  In sum, Plaintiff's latest letter unambiguously indicates that: (a) at least five new complaints, elaborating on Plaintiff's already-found-to-be-meritless claims are currently in production; and (b) Plaintiff has failed to take the certification requirement posed by his currently operable lenient preclusion order seriously and intends to keep treating the requirements of that order as mere "check-mark" requisites.

## II.  Amplification of Plaintiff's Preclusion Order

Whilst it has become apparent that the current leniently-termed preclusion order failed to curtail Plaintiff's appetite for frivolous or vexatious litigation, this Court now faces the

---

[14]  In addition, Plaintiff asserted that this Court "leaks" its legal rulings to the correction officers at Plaintiff's place of confinement prior to issuing the Court's decisions.  <u>See</u> Instant Action, Docket Entry No. 4.

task of selecting a proper model for amplifying Plaintiff's order
of preclusion and providing him with a due notice of -- and an
opportunity to respond to -- such amplification.  In that
endeavor, the Court turns for guidance to the history, goals and
language of the legislation which inapplicability to him
Plaintiff celebrated in his submissions made in the Corzine
Action (where he stressed that, after he completed his prison
term and became a civilly committed individual, he came outside
the reach of the PLRA).

It has become axiomatic that, when Congress enacted the
Title VIII of the Omnibus Consolidated Rescissions and
Appropriations Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321,
on April 26, 1996, the congressional purpose was, "primarily[,]
to curtail claims brought by prisoners under 42 U.S.C. § 1983 and
the Federal Torts Claims Act . . . many of which are routinely
dismissed as legally frivolous."  Santana v. United States, 98
F.3d 752, 755 (3d Cir. 1996).  In other words, the crucial part
of the congressional plan was to curtail meritless prisoner suits
through various restrictions.  See id.

A.   The "Three Strikes Provision"

One of these restrictions, commonly known as the "three
strikes provision," prohibits prisoners with "three strikes" from
taking advantage of 28 U.S.C. 1915(a)(1), the federal in forma
pauperis statute, which authorizes a waiver of the fees for

filing an action or appeal in federal court;[15] a prisoner receives a "strike" each time a federal court dismisses one of the prisoner's actions or appeals as frivolous, as malicious, or for failure to state a claim.  See PLRA 804(d), 110 Stat. at 1374-75 (adding 42 U.S.C. § 1915(g)).

This provision has four key components: (a) it only applies to prisoners; (b) it applies to civil actions and appeals; (c) it applies when the prisoner has "three strikes"; and (d) it does not apply if the prisoner "is under imminent danger of serious physical injury."[16]  28 U.S.C. § 1915(g).  All circuit courts,

---

[15] While the PLRA amended 1915(a) to refer to the submission of a statement of the assets of a "prisoner," in forma pauperis remains available to all persons, not just prisoners.  See, e.g., Floyd v. U.S. Postal Serv., 105 F.3d 274, 275-76 (6th Cir. 1997) (stating that "the only logical conclusion is that Congress intended to use the phrase 'person possesses' [in 1915(a)(1)] instead of 'prisoner possesses'").

[16] The exact language of the "three strikes provision" reads as follows:

> In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g).  Notably, to qualify for the imminent danger exception, the plaintiff must detail the nature of harm and be in imminent threat of suffering serious physical injury at the time he submits his pleadings for filing.  See White v. Colorado, 157 F.3d 1226, 1232 (10th Cir. 1998) (plaintiff's use of imminent danger exception to three strikes provision is precluded because

that have adjudicated the constitutionality of the provision,
have upheld the provision against constitutional challenges, and
the United States Supreme Court invariably denied certiorari to
challenges to the "three strikes provision."   See, e.g., Higgins
v. Carpenter, 258 F.3d 797 (8th Cir. 2001); Abdul-Akbar v.
McKelvie, 239 F.3d 307 (3d Cir. 2001), cert. denied, 121 S. Ct.
2600 (2001); Rodriguez v. Cook, 169 F.3d 1176 (9th Cir. 1999);
White v. Colorado, 157 F.3d 1226 (10th Cir. 1998), cert. denied,
526 U.S. 1008 (1999); Rivera v. Allin, 144 F.3d 719 (11h Cir.
1998), cert. dismissed, 524 U.S. 978 (1998); Wilson v. Yaklich,
148 F.3d 596 (6th Cir. 1998); Carson v. Johnson, 112 F.3d 818 (5h
Cir.), reh'g denied, 1997 U.S. App. LEXIS 16984 (1997).  In so
ruling, the courts utilized, inter alia, the following reasoning:

(a)   the interests that the litigants challenging the provision
      sought to vindicate through filing the cases were not
      fundamental, see Rodriguez, 169 F.3d at 1180; White, 157
      F.3d at 1233-34; Rivera, 144 F.3d at 724; Carson, 112 F.3d
      at 821;

(b)   an alternative remedy to the federal courts was available,
      namely the prisoner could bring a case in state court, see
      Abdul-Akbar, 239 F.3d at 318; Wilson, 148 F.3d at 605; see

defendant failed to specify nature of harm); Medberry v. Butler,
185 F.3d 1189, 1193 (11th Cir. 1999) (plaintiff cannot use
imminent danger exception to the "three strikes provision" if
danger ceased prior to his submission of the complaint to his
prison officials for mailing to the court).

also <u>Rivera</u>, 144 F.3d at 724 n.9;

(c)   the prisoner challenging the provision lacked actual injury, <u>see</u> <u>White</u>, 157 F.3d at 1234;

(d)   the ability to pursue civil actions is subject to congressional limitation, since proceeding <u>in</u> <u>forma</u> <u>pauperis</u> in civil actions is a privilege, not a right, <u>see</u> <u>Abdul-Akbar</u>, 239 F.3d at 317; <u>Rodriquez</u>, 169 F.3d at 1180; <u>White</u>, 157 F.3d at 1233; <u>Rivera</u>, 144 F.3d at 723; and

(e)   the "imminent danger" exception guarantees that prisoners with claims implicating fundamental interests actually are able to raise such claims in federal court.  <u>See</u> <u>Higgins</u>, 258 F.3d at 800; <u>Abdul-Akbar</u>, 239 F.3d at 319; <u>White</u>, 157 F.3d at 1234.

**B.   Three Strikes Provision and Inherent Judicial Power**

Academic literature observed that, upon its enactment, the "three strikes provision" was reflective of the already long-recognized inherent authority that courts possess to curtail abusive litigation through the imposition of injunctions against filing.  <u>See</u>, <u>e.g.</u>, Randal S. Jeffrey, <u>Restricting Prisoners'</u> <u>Equal Access to the Federal Courts: The Three Strikes Provision</u> <u>of the Prison Litigation Reform Act and Substantive Equal</u> <u>Protection</u>, 49 Buffalo L. Rev. 1099, 1141 (2001).  Indeed, a federal court's inherent power to sanction abusive litigants by imposing filing restrictions is well established, <u>see</u>, <u>e.g.</u>,

<u>Werner v. Utah</u>, 32 F.3d 1446, 1447-48 (10th Cir. 1994) (<u>per
curiam</u>); <u>De Long v. Hennessey</u>, 912 F.2d 1144, 1147-48 (9th Cir.
1990); <u>Safir v. United States Lines, Inc.</u>, 792 F.2d 19, 25-26 (2d
Cir. 1986), <u>cert. denied</u>, 479 U.S. 1099 (1987); <u>see also</u> <u>Chambers
v. Nasco, Inc.</u>, 501 U.S. 32, 44 (1991) (discussing the authority
for, and scope of, the inherent powers of courts); <u>In re
McDonald</u>, 489 U.S. 180 (1989) (<u>per curiam</u>) (prohibiting the
petitioner from filing any additional extraordinary writs <u>in
forma</u> <u>pauperis</u>), and federal courts controlled overly litigious
and abusive litigants by injunctions restricting further <u>in forma
pauperis</u> filings.[17]  Thus, academics analogized Section 1915(g)

---

[17]  Generally, courts relied upon the All Writs Act, 28
U.S.C. 1651, for the authority to enter such injunctions.  <u>See,
e.g.</u>, <u>Safir v. United States</u>, 792 F.2d 19, 23 (2d Cir. 1986); <u>In
re Oliver</u>, 682 F.2d at 446.  In <u>Rudnicki v. McCormack</u>, 210 F.
Supp. 905 (D.R.I. 1962), the District of Rhode Island enjoined a
vexatious litigant who had filed numerous baseless complaints
(which were somewhat different but invariably arose from his
discharge from employment and named, as defendants, a certain
range of judicial and governmental officials).   The injunction
prohibited further litigation against these defendants, or other
litigation arising out of the discharge.  The court noted that
while it found a dearth of relevant precedent in federal
jurisprudence, "as early as 1709, the English court acted to
grant an injunction against the commencement of suits contesting
matters which had been settled in previous litigation."  <u>Id.</u>
at 909-10 (citing <u>Earl of Bath v. Sherwin</u>, 4 Brown's Parl. Cas. 373
(1709)).  "In more recent times, this power was affirmed, and
perhaps extended, in England by the Vexatious Actions Act, 59 &
60 Vict. c. 51, which authorized the High Court to enjoin the
bringing of further actions by 'any person (who) has habitually
and persistently instituted vexatious legal proceedings without
any reasonable ground.'"  <u>Id.</u> at 910.  The <u>Rudnicki</u> court cited
<u>Clinton v. United States</u>, 297 F.2d 899 (9th Cir. 1961), and
<u>Meredith v. John Deere Plow Co.</u>, 261 F.2d 121 (8th Cir. 1958),
which had affirmed injunctions prohibiting the continued re-

the "three strikes provision" to the judicial practice of
entering injunctions against abusive litigants and suggested that
section 1915(g) did little more than codify an already existing
judicial practice.[18]  See, e.g., Jennifer L. Mercer and William C
Elwell, Prisoners' Rights: Procedural Means of Enforcement under
42 U.S.C. § 1983, 88 Geo. L.J. 1753 (2000).

### C.  Courts' Treatment of Abusive Litigation

The Supreme Court has had its fair share of abusive
litigants and in 1989, for the first time, entered an order
prospectively denying pauper status to an indigent petitioner. 92
The Court subsequently has entered similar orders against other
abusers.  See In re McDonald, 489 U.S. 180, 180 (1989) (noting
plaintiff's history of 73 filings over 18 years and prospectively
denying plaintiff pauper status for seeking relief).  In 1991,
the Court amended Rule 39.8 of the Rules of the Supreme Court of
the United States to read as follows: "If satisfied that a

---

litigation by vexatious litigants.  See Rudnicki, 210 F. Supp. at
910.

[18] It shall be noted, however, that, unlike the broad sweep
of section 1915(g), courts traditionally have proceeded very
carefully in imposing injunctive relief, mindful of the nature of
the right that they were restricting with such injunctions, by
first ensuring that the litigant was a truly flagrant abuser and
then entering narrow injunctions directed at the specific abuse.
See Abdul-Akbar, 901 F.2d at 333-34 (3d Cir. 1990) (stressing
that "only indigent litigants . . . whose history of repetitious
and frivolous filings indicates a clear intent to abuse the
courts and the in forma pauperis process, can be subjected to
such an injunction").

petition for a writ of certiorari, jurisdictional statement, or petition for an extraordinary writ, as the case may be, is frivolous or malicious, the Court may deny a motion for leave to proceed in forma pauperis." In re Amendment to Rule 39, 500 U.S. 13, 14 (1991). The Court since has invoked Rule 39.8 in its decisions prospectively denying pauper status to abusive indigents. See Attwood v. Singletary, 516 U.S. 297 (1996); In re Sassower, 510 U.S. 4 (1993); Day v. Day, 510 U.S. 1 (1993); Zatko v. California, 502 U.S. 16.

And while typical injunctions entered by federal courts are analogous, in their requirements, to the currently operable order of preclusion entered against Plaintiff, see, e.g., Sassower v. Fidelity & Deposit Co. of Md., 49 F.3d 1482 (11th Cir. 1995); Ketchum v. Cruz, 961 F.2d 916, 921 (10th Cir. 1992); Cofield v. Alabama Pub. Serv. Comm'n, 936 F.2d 512, 518 (11th Cir. 1991); Stimac v. United States Dep't of Justice, 1990 U.S. App. LEXIS 19591, at *8 (7th Cir. Nov. 2, 1990); In re Green, 669 F.2d 779 (D.C. Cir. 1981); Harrison v. Seay, 856 F. Supp. 1275 (W.D. Tenn. 1994); Carter v. Telectron, Inc., 452 F. Supp. 944, 999-1001 (S.D. Tex. 1977), some courts qualified false certifications (asserting that the claims in the complaint claims are foreclosed by controlling law) as an act of contempt, see, e.g., In re Green, 669 F.2d at 782, and other courts have limited the number of complaints that an abusive litigant could file per year. See,

e.g., Rubins v. Roetker, 737 F. Supp. 1140, 1145 (D. Colo. 1990) (restricting an abusive litigant to "one action per year unless he claims he is about to be subjected to immediate physical harm," under penalty of contempt and assessment of costs and attorneys' fees for a violation of the court's order), dismissal aff'd, 936 F.2d 583 (10th Cir. 1991); see also Briggs v. Comfort Inn, 1991 U.S. App. LEXIS 867, at *4 (4th Cir. Jan. 18, 1991); In re Tyler, 839 F.2d 1290, 1294 (8th Cir. 1988); Franklin v. Murphy 745 F.2d 1221, 1231-32 (9th Cir. 1984); Jones v. Warden of the Stateville Correctional Ctr., 918 F. Supp. 1142, 1155 (E.D. Ill. 1995); accord Michael J. Mueller, Abusive Pro Se Plaintiffs in the Federal Courts: Proposals for Judicial Control, 18 J.L. Reform 93, 157 (1984) (noting that contempt threat is virtually meaningless to prisoner serving lengthy sentence, and that such abusive litigants continue to abuse pauper status and judicial process despite criminal contempt sentences). This District, too, had its share of abusive litigation and took firm actions to curb such abuses. See e.g., Llarena v. Kinkos, 05-3410 (JBS), Docket Entry No. 2 (standing order issued by Chief Judge Bissel, directing plaintiff to show cause within thirty days as to why plaintiff shall not be barred from filing any document without leave of court and mandating the Clerk not to accept any document of any kind from plaintiff except for plaintiff's timely response to that order to show cause).

D.    **The Scope of Amplification**

The methodology adopted by Chief Judge Bissel in <u>Llaurena</u> and by the District of Colorado and the Tenth Circuit in <u>Rubins</u> appears to be instructive and relevant to the situation at hand.

Here, Plaintiff commenced fifteen actions in this District, fourteen of which were civil rights litigations dismissed at both trial and appellate levels, and the remaining one was a dismissed habeas action.  In addition, even after this Court entered the currently operable order of preclusion, Plaintiff initiated at least two actions accompanied by false certifications (stating that Plaintiff's challenges were not barred by the controlling law): (a) the Main Action, where Plaintiff disregarded Judge Sheridan's guidance with respect to his McGreevey Action when Plaintiff asserted denial of access to the courts on the basis of an alleged denial of library material that Plaintiff wished to read in order to "learn more about real estate"; and (b) the Freeholders Action, where Plaintiff re-raised <u>Heck-</u>barred challenges (numerously dismissed by this Court, Judges Thompson, Hayden and Sheridan, and by the Court of Appeals, in Plaintiff's Brown Action, McGreevey Action, Human Services Action, Special Treatment Annex Action and New Jersey I Action), as well as challenges against the Freeholders barred by the controlling law explained to Plaintiff by this Court in the Corzine Action.

Moreover, Plaintiff submitted insufficient certifications in his Main and Trulonie Actions and – to add to the foregoing -- asserted substantively invalid claims in the Instant Matter.[19] Finally, Plaintiff now intends to produce five more actions on the basis of his conclusively dismissed Otiono action.

Consequently, in line of the decisions entered in <u>Rubins</u> and <u>Llaurena</u>, and being mindful of the goals of -- as well as solutions offered by – the three strikes provision of the PLRA, this Court will amplify Plaintiff's currently operable order of preclusion as follows:[20]

1. Each Plaintiff future <u>in forma pauperis pro se</u> submission will have to consist, *under penalty of criminal contempt*, of:

   (a) a short and clear complaint;

   (b) a completed application to proceed <u>in forma pauperis</u>; and

   (c) a written certification briefly summarizing the nature of Plaintiff's challenges and stating that the

---

[19] Notably, Plaintiff's submissions indicate his extensive research of law but – unfortunately, only of the law that Plaintiff's deems favorable. <u>See</u>, <u>e.g.</u>, Otino Action, Docket Entry No. 4 (a three-page submission, the last page of which is covered, wall-to-wall, with citations to state and federal case law).

[20] Same as the currently operable order of preclusion, the new order of preclusion will apply *only* to Plaintiff's <u>in forma pauperis pro se</u> submission.

allegations in the complaint are new, factually and *legally*, and that *none* of these claims is foreclosed by controlling law known to Plaintiff or explained to Plaintiff by any federal judge;[21]

2.  In the event Plaintiff asserts that he is in imminent physical danger, Plaintiff's submission will have to include, in addition to the documents listed in Paragraph 1, above, a *short and clear* statement:

    a.  detailing *facts*, on the basis of which Plaintiff believes that he is in imminent physical danger;[22] and

    b.  unambiguously verifying that Plaintiff has first-hand knowledge of the events asserted and his understanding that he makes his allegations *under penalty of perjury.*

3.  Plaintiff will be allowed to initiate only *one* more in forma pauperis pro se action during this calendar year, and only *one* in forma pauperis action per each following calendar year (unless Plaintiff's submission asserts, in accordance with the requirements described in Paragraphs 1 and 2, that

---

[21] To the extent, Plaintiff is encouraged to study all decisions entered by the judges in this District and in the Court of Appeals with great care.

[22] Speculative assertions, bold statement, conclusory accusations and the like will not be entertained, e.g., Plaintiff cannot substitute facts with statements that a certain correction officer is "lying out [of] her ass" or that supervisory officials at his facility are "arrogant, arbitrary, tyrant, autocrastic dictatorship."

Plaintiff is in imminent danger of serious physical injury).

4.  Plaintiff's first *in forma pauperis pro se* submission made after the entry of the Order accompanying this Opinion, as well as *every first submission* made by Plaintiff during each following calendar year ("First Submission"), will have to -- in addition to the documents listed in Paragraph 1, above -- include either:

   a.  a *clear and concise* written statement showing cause as to why Plaintiff's quota of one *in forma pauperis pro se* action per calendar year should be modified ("Show Cause Response");[23] or

   b.  a written statement unambiguously indicating that Plaintiff knows of no bases for modification of his quota of one *in forma pauperis pro se* action per calendar year ("Waiver").  The fact of the Clerk's receipt of Plaintiff's First Submission – during any given year -- without a Show Cause Response would be automatically deemed a Waiver affecting the calendar

---

[23] The Show Cause Response should outline only the factual grounds which are: (a) known to Plaintiff personally, and (b) could clearly serve as bases for meritorious litigation.  The Court selects this yearly re-review period to ensure that, in the event Plaintiff – in the course of a year – accumulates certain meritorious grounds for civil litigation, Plaintiff would have an opportunity to briefly outline all these grounds in one short and clear document presented for the Court's yearly determination as to whether Plaintiff's preclusion order should be modified, and he would do so without endangering his rights through the working of the statute of limitations.

year during which such First Submission is received.

An appropriate Order accompanied this Opinion.


s/William J. Martini

_____
            **WILLIAM J. MARTINI**
      **United States District Judge**

Dated: September 1, 2009